**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Case No. |
| BNT Services, Inc. | Chapter 11 |
| Debtor. | |

_______________________________________/

**DECLARATION OF BRET ROBBINS IN SUPPORT OF DEBTOR'S FIRST-DAY MOTIONS FOR (I) INTERIM AND FINAL AUTHORITY TO USE CASH COLLATERAL, (II) CONTINUED USE OF CERTAIN BANK ACCOUNTS AND RELATED CASH-MANAGEMENT ARRANGEMENTS, AND (III) PAYMENT OF CERTAIN PREPETITION WAGES, PAYROLL TAXES, EMPLOYEE WITHHOLDINGS, AND EMPLOYEE BENEFITS**

I, Bret Robbins, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

**Background and Authority**

1. I am the President of BNT Services, Inc. (the "Debtor"). I am authorized to submit this declaration on the Debtor's behalf in support of: (a) the Debtor's Emergency Motion for Interim and Final Authorization to Use Cash Collateral (the "Cash Collateral Motion"); (b) the Debtor's Emergency Motion to Continue Use of Certain Bank Accounts and Related Cash-Management Arrangements (the "Bank Accounts Motion"); and (c) the Debtor's Emergency Motion for Entry of an Order Authorizing Payment of Certain Prepetition Wages, Payroll Taxes, Employee Withholdings, and Employee Benefits and Granting Related Relief (the "Payroll Motion" and, collectively with the Cash Collateral Motion and Bank Accounts Motion, the "First-Day Motions").

2. Except where otherwise stated, the facts in this declaration are based on my personal knowledge; my review of the Debtor's books, records, and financial reports; and

information provided to me in the ordinary course by personnel responsible for the Debtor's operations, payroll, and financial administration. If called to testify, I could and would testify competently to the matters stated in this declaration.

3. The Debtor is a Florida construction company that sells and installs hurricane-rated impact windows, doors, and related products for residential and commercial customers in Florida. The Debtor operates from leased premises in Pompano Beach, Florida and has more than one hundred active construction projects.

4. On July 27, 2026 (the "Petition Date"), the Debtor commenced this Chapter 11 case. The Debtor continues to operate its business and manage its property as debtor in possession under 11 U.S.C. §§ 1107(a) and 1108. No trustee, examiner, or statutory committee has been appointed.

5. The Debtor's ability to preserve value as a going concern depends on uninterrupted receipt of customer payments; retention of its employees; payment of installers and other job-critical service providers; maintenance of insurance, facilities, vehicles, communications, and payroll systems; and timely completion of customer projects. An interruption in these operations would impair collections, delay projects, erode customer confidence, and materially diminish estate value.

**Need for Interim Use of Cash Collateral**

6. The Debtor requires immediate access to operating funds to pay actual and necessary ordinary-course expenses, including payroll, installers, rent, utilities, insurance, fuel, vehicle expenses, permits, job-critical supplies, materials, merchant-processing charges, and other costs necessary to continue operating its business.

7. The Debtor prepared an initial three-week cash-basis forecast (the "Interim Cash Budget"), attached as Exhibit A to the Cash Collateral Motion. The Interim Cash Budget projects: (a) beginning cash of approximately $87,566.40; (b) total customer collections of approximately $383,357.91 during the three-week interim period; (c) total operating disbursements of approximately $353,614.36; and (d) projected ending cash of approximately $117,309.94, subject to the assumptions, timing, and ordinary-course variances reflected in the Interim Cash Budget.

8. The Interim Cash Budget projects weekly customer collections of approximately $115,599.37, $134,062.86, and $133,695.68, respectively, for the three weeks ending August 2, August 9, and August 16, 2026. Those projected receipts are tied to identified customer balances and project-completion milestones. The Debtor will continue to monitor actual collections and disbursements and provide appropriate reporting and variance information.

9. The Interim Cash Budget reflects actual and necessary operating disbursements during the requested interim period, including direct project costs, payroll and labor, occupancy and utility costs, vehicle and delivery expenses, insurance, and sales, general, and administrative expenses. These expenses are necessary to keep projects moving, complete installations, collect customer balances, and preserve the Debtor's going-concern value.

10. The Debtor understands that Truist Bank, N.A., the United States Small Business Administration, and FHIS Finance, LLC assert liens, security interests, and/or claims against some or all of the Debtor's assets and proceeds. The Debtor has not completed a full lien analysis and does not admit the validity, amount, priority, extent,

perfection, enforceability, or cash-collateral status of any asserted lien or claim. The Debtor expressly reserves all rights.

11. Without prompt interim authority to use cash collateral substantially in accordance with the Interim Cash Budget, the Debtor faces a material risk of interrupted payroll, missed project costs, delayed project completion, reduced collections, employee and customer disruption, and rapid loss of going-concern value.

12. The Debtor proposes to provide the protections described in the Cash Collateral Motion, including replacement liens only to the extent of any proven postpetition diminution in value, a contingent superpriority claim only to the extent authorized by the proposed order and legally applicable, maintenance of ordinary-course insurance, and financial and variance reporting. In my business judgment, these protections appropriately balance the need for immediate operations with the rights of parties asserting an interest in cash collateral.

13. I believe that the interim use of cash collateral substantially in accordance with the Interim Cash Budget is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtor, its estate, and all parties in interest.

**Existing Bank Accounts and Cash-Management Arrangements**

14. The Debtor conducts its operating business through two checking accounts maintained at Seacoast National Bank ("Seacoast"), ending in 5761 and 5841 (collectively, the "Existing Accounts"). The Existing Accounts are integrated with the Debtor's ordinary-course cash-management system.

15. The Debtor uses the Existing Accounts to receive customer deposits, customer progress payments, credit-card and merchant-processor proceeds, and other collections.

The Existing Accounts also support payroll, ACH and wire activity, automatic drafts, recurring vendor and subcontractor payments, insurance payments, and other ordinary-course disbursements.

16. The Debtor's business depends on the continuous flow of receipts and disbursements through these arrangements. In particular, prompt receipt of customer and merchant-processor proceeds is necessary to fund payroll, project costs, and other expenses reflected in the Interim Cash Budget.

17. Moving the Debtor's banking and merchant-processing arrangements immediately would require the Debtor to reroute customer deposits and credit-card receipts; change merchant-services profiles; issue replacement payment instructions to customers, vendors, and subcontractors; re-establish payroll, ACH, and wire authorizations; address outstanding checks and automatic drafts; and update its accounting systems. Those actions cannot be completed immediately without substantial operational risk.

18. Based on the Debtor's operating experience, an immediate migration could result in delayed or held customer receipts, interrupted payroll, returned items, delayed payments to insurers, vendors, and subcontractors, and disruption to active projects. These risks are especially acute at the outset of this Chapter 11 case, when maintaining customer confidence and completing projects are critical to collections and going-concern value.

19. I understand that Seacoast is not presently an authorized depository for purposes of 11 U.S.C. § 345. The Existing Accounts are, however, ordinary commercial operating accounts at a federally insured national bank. The Debtor has advised the

Office of the United States Trustee of Seacoast's status and will cooperate with the United States Trustee, maintain complete books and records, comply with applicable reporting requirements, title the Existing Accounts to reflect the Debtor's debtor-in-possession status, and execute reasonable documentation requested by the United States Trustee or Seacoast.

20. In my business judgment, continued use of the Existing Accounts and related merchant-services, credit-card-processing, payroll, ACH, wire, customer-deposit, and automatic-draft arrangements is necessary to preserve the operational status quo and avoid immediate disruption. The limited relief requested in the Bank Accounts Motion is in the best interests of the estate and creditors.

**Prepetition Payroll Obligations**

21. The Debtor employs approximately 25 W-2 employees in salaried and hourly positions. These employees perform essential functions, including project administration, installation, customer service, sales support, and management.

22. The Debtor pays its W-2 employees weekly, each Friday, for the preceding seven-day period. The next weekly payroll is due on Friday, July 31, 2026, for work performed from July 20, 2026 through July 26, 2026 (the "Payroll Period"). Because the Payroll Period ended before the Petition Date, the resulting wages and related obligations are prepetition obligations.

23. The Debtor uses Payroll Offices of America as its ordinary-course payroll-services provider. Payroll is customarily funded through the Debtor's operating account at Seacoast.

24. The Debtor seeks authority under the Payroll Motion to pay only actual obligations incurred for the Payroll Period, up to an aggregate cap of $40,000.00. Those obligations consist of W-2 employee wages and salaries; employee withholdings and deductions; employer payroll taxes; employee benefits and employer contributions customarily paid with payroll; and ordinary-course payroll-processing charges directly associated with the Payroll Period.

25. The Debtor's recent payroll information reflects approximately $32,987.72 in gross payroll, $24,488.81 in net employee payments, $6,855.52 in combined payroll taxes, $3,873.34 in employee deductions, and $4,372.27 in employer-paid benefit amounts. The requested $40,000.00 cap is intended to cover only actual Payroll Obligations for the Payroll Period, with a reasonable cushion for ordinary payroll fluctuations.

26. The Payroll Motion does not seek authority to pay prepetition claims of independent contractors, vendors, trade creditors, or other nonemployee service providers. Any payment authority will be used only for actual Payroll Obligations for the Payroll Period and remains subject to any applicable cash-collateral order or consent.

27. The Debtor's employees depend on timely payment for ordinary living expenses. If the Debtor cannot fund the Payroll Obligations when due, the Debtor is likely to suffer employee hardship, diminished employee confidence and morale, potential attrition, and operational disruption. The resulting loss of workforce continuity would impair the Debtor's ability to serve customers, complete projects, collect receivables, and preserve estate value.

28. Prompt payment of the narrowly limited Payroll Obligations is necessary to retain the workforce required for the Debtor's ongoing operations and to avoid immediate and irreparable harm. In my business judgment, the requested authority is a sound exercise of the Debtor's business judgment and is in the best interests of the Debtor, its estate, creditors, employees, and other parties in interest.

**Conclusion**

29. For the foregoing reasons, I respectfully submit that entry of the requested orders granting interim cash-collateral authority, authorizing the continued use of the Existing Accounts and related cash-management arrangements, and authorizing the payment of the limited prepetition Payroll Obligations is necessary to avoid immediate and irreparable harm and preserve the Debtor's business as a going concern.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 27, 2026.

*/s/ Bret Robbins*
Bret Robbins
President, BNT Services, Inc.